# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| TAMMY E. FALGOUT, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | )    CV-07-BE-01237-NE |
| | ) |
| MICHAEL J. ASTRUE, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

## I. INTRODUCTION

The claimant, Tammy E. Falgout, protectively filed applications for Disability Insurance benefits and Supplemental Security Income payments on October 3, 2003, alleging disability commencing on October 3, 2003[1] because of "chronic obstructive pulmonary disease (COPD), asthma, bronchitis, panic attacks, anxiety, migraines, diverticulosis, and right shoulder pain." (R. 20). The Commissioner denied the claims. (R. 35-36). The claimant filed a timely request for a hearing before an Administrative Law Judge. (R. 82-83). The ALJ held a hearing on September 15, 2005. (R. 432-453). In a decision dated January 20, 2006, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act, and therefore, was not eligible for Disability Insurance Benefits and Supplemental Security Income Payments. (R. 19-32). On January 30, 2006,

---

[1] The claimant initially alleged that she became disabled on September 18, 2002, but she subsequently amended the onset of disability to date to October 3, 2003. (R. 20). Claimant had previously filed a separate application for disability benefits on December 12, 2002, but did not appeal the denial of that application. (R. 59-63, 405-06).

Claimant requested review of that decision, and on April 30, 2007, the Appeals Council denied review. (R. 7, 14-15, 19-22). The claimant has exhausted her administrative remedies, and this court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383 (c)(3). For the reasons stated below, the court will REVERSE and REMAND the decision of the Commissioner.

## II. ISSUES PRESENTED[2]

1. Whether the ALJ failed to properly develop the record when he did not order further pulmonary function testing.

2. Whether the ALJ erred in relying on claimant's substance abuse to preclude a finding of disability.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. Under this limited standard of review, this court will not decide the facts anew, make credibility determinations, or re-weigh the evidence. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2000); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). However, "[n]o presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*, but the Commissioner's factual findings must be supported by substantial evidence. *Doughty*

---

[2] Claimant raises other issues; however, because of the court's disposition of the issues listed, it need not address the rest.

2

*v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  In other words, substantial evidence is "more than a mere scintilla." *Falge v. Apfel*, 150 F.3d 1320, 1324 (11th Cir. 1998). The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999.  Furthermore, a reviewing court must not only look to those parts of the record that support the decision of the ALJ, but must also view the record in its entirety and take account of evidence that detracts from the evidence on which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2000). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520, 416.920

(2008).

The Social Security regulation that applies to allegations that claimant failed to follow prescribed treatment, 20 C.F.R. § 404.1530, provides as follows:

> (a) *What treatment you must follow.*  In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.
> (b) *When you do not follow prescribed treatment.*  If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits.
> (c) *Acceptable reasons for failure to follow prescribed treatment.*  We will consider your physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if you have an acceptable reasons for failure to follow prescribed treatment.  The following are examples of a good reason for not following treatment:
> (1) The specific medical treatment is contrary to the established teaching and tenets of your religion.  (2) The prescribed treatment would be cataract surgery for one eyes, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment. (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.  (4) The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g. organ transplant), or other reason is very risky.

In assessing the medical evidence, an ALJ must "state with particularity the weight he gave the different medical opinions and the reasons therefor."  *Sharfarz v. Bowen,* 825 F.2d 278, 279 (11th Cir. 1987).

## V. FACTS

At the time of the ALJ's decision, Claimant was a 43 year-old woman with an 11th grade education, who also has a GED and two years of additional training as a medical assistant.  (R. 20).  She has previously worked as a waitress, "serger," cashier, type setter, and a housekeeper. (R. 72, 119, 435, 455).  Because her "last insured date" is March 31, 2004, she must establish disability on or prior to that date.

4

The medical evidence from February of 1999 to December of 2003 indicates that claimant has a history of respiratory problems (COPD bronchitis, seasonal allergies, sinus infections); stomach problems ( peptic ulcer disease, right sided abdominal pain, epigastric pain, muscle spasms in stomach); anxiety attacks, and complaints of right shoulder pain.  (R. 21,  205-22; 267-91).  She was treated conservatively with medication for these ailments.  (R. 21).

On March 11, 2003, Dr. Jon Rogers, a consultative psychologist, evaluated claimant for the Disability Determination Service.  Prior to the evaluation, claimant had never received treatment from a mental health professional, but admitted a history of two suicide attempts at age 18 and acknowledged that she had received prescriptions from her family doctor for amitriptyline (an antidepressant) and perphenzine (an antipsychotic, decreasing abnormal excitement in the brain).  She complained to Dr. Rogers of symptoms of depression and anxiety/panic.  When asked about substance abuse, claimant reported smoking two or more packs of cigarettes a day for 30 years,  having a drinking problem for 20 years (drinking three 4-pack wine coolers a day at the peak of her problem) and using marijuana since age 16.  (R. 225).  She admitted smoking marijuana in February 2003 and indicated that the marijuana use was on-going, but characterized it as occasional and stated that it was "funded through friends' gifts."  (R. 225).  Dr. Rogers stated that the quality of claimant's daily activities was "below average."  His diagnoses included: pain disorder, depressive disorder, marijuana abuse, anorexia nervosa, various physical problems associated with the mental problems, psychosocial stress stemming from relational problems and occupational problems.  (R. 227).  Dr. Rogers set claimant's Global Assessment of Functioning score at 50, indicating a serious impairment in functioning.  (R. 227).  He determined that "[d]ue to substance abuse, this claimant would not be able to manage her

financial benefits." (R. 228). He further opined that "her ability to understand, remember, and carry out instructions and respond appropriately to supervision, co-workers, and work pressures in a work setting would be *severely* impaired." (R. 228, 229) (emphasis added).

On March 13, 2003, Dr. S. Reddy, a disability consultant, examined claimant. She complained of shortness of breath with coughing, wheezing and chest pain; abdominal pain; and frequent urination with stress incontinence. Dr. Reddy noted markedly decreased breath sounds and poor air exchange with "fine crackles all over the chest and lung fields." (R. 231). Dr. Reddy's office performed pulmonary function tests, and listed results as "PFT - .52" FVC [forced vital capacity] .85 liters Post, List 1.25; FEV [forced expiratory volume] - .67 liters Post, List 1.05. These test results, if valid, would meet the listing for COPD. Dr. Reddy's musculoskeletal examination revealed no joint deformities, swelling or effusions and normal range of movements in all joints and lumbar spine. While the joints in her shoulder showed normal range, full abduction and extension of the shoulders resulted in pain. Dr. Reddy's diagnoses included moderately severe COPD, arthritis, and history of gastroesophageal reflux disease. (R. 231).

However, when Dr. Carol Slaw, an agency doctor, reviewed Dr. Reddy's medical records on March 31, 2003, she made the following notes: "COPD. Insufficient evidence to rate severity. The curves on the pre & post [unreadable] studies are invalid for SSA standards. Flats take-off, wavy curves, variability. Dr. Reddy requests that we dis-regard the unlabeled pre or post studies." (R. 233). An agency "Report of Contact" indicates that on that same date, a telephone contact occurred between the agency and Dr. Reddy or her office and relayed Dr. Reddy's instruction to "disregard the set of tracings which are not labelled (sic) pre or post." (R. 234).

On March 21, 2003, claimant filled out a Drug and Alcohol Use Questionnaire. (R. 128).

6

She stated that she did not currently drink but did smoke marijuana (admitting to once in the past month), and indicated that she had smoked since high school.

On March 24, 2003, Dr. Frank Nuckols, a consulting psychiatrist, prepared a Psychiatric Review Technique evaluation on claimant, but the record does not reflect that he examined her. Dr. Nuckols evaluated the following: an affective disorder; an anxiety-related disorder; somatoform disorder (diagnosis of pain disorder associated with unreadable); substance addiction disorder (but noting claimant's statement that all substance abuse was in the past except once monthly use of marijuana).   The doctor concluded that his evaluation did not support a GAF score of 50.  However, it did support the existence of mild to moderate but not marked mental impairments.  Accordingly, the doctor made the following functional capacity assessment, noting the following areas where claimant had moderate limitations: "A&B:  cl. can remember, understand, and carry out simply but not detailed instructions; cl. could sustain attention to routine tasks for 2 hr. periods over an 8 hr day with customary breaks; cl. should be able to maintain attendance w/in customary tolerance w/ ordinary supervision; cl needs a flexible daily schedule & all customary breaks.  C: cl. needs casual contact w/ public and co-workers which is brief and infrequent.  D: changes in work setting should be explained thoroughly and be infrequent." (R. 235-252).

With respect to drug and alcohol abuse, the doctor noted information from a third party who had known claimant for six years and who substantiated claimant's representations about no current drug or alcohol problem, and the doctor opined that no material drug and alcohol problems existed.  Because the marijuana use was so limited, the doctor concluded that it was "not material to her being unable [to] work."  (R.  243, 245, 248 ).

On January 9, 2004, claimant filled out another Drug and Alcohol Questionnaire, denying use of alcohol or drugs, except prescription drugs and cigarettes.  (R. 173).

On January 27, 2004, Psychologist Mary Arnold conducted a consultative exam of claimant.  At the exam, claimant admitted to smoking two packs per day and to drinking 20 cups of coffee per day, reduced from a history of 3 pots (42 cups per pot) of coffee per day.  With respect to daily activity, Dr. Arnold noted that claimant observed a sedentary routine.  With respect to her intellectual functioning, Dr. Arnold noted the absence of formal testing, but estimated that she would fall in the "low average range" and that she has the ability to manage funds.  Dr. Arnold noted that when she was referred to the local mental health clinic, she did not go.  Dr. Arnold's diagnoses included "Axis 1:caffeine intoxication, nicotine intoxication, adjustment disorder, NOS; Axis II:  Personality disorder NOS; Axis III: COPD in a smoker (3 pks/day); (Right) shoulder injury, chronic pain; Diverticulosis; Menopausal w/o hormone therapy; Axis IV: Problems with access to healthcare, Economic problems; Axis V: GAF (current) = 57." (R. 294-5).

On February 2, 2004, Dr. Reddy performed a second consultative examination.  At that time, claimant admitted to smoking one-and-a-half packs per day with a 26-year history of smoking, but denied alcohol consumption.  Claimant stated that she had had breathing problems for two years, getting progressively worse with a cough production of thick, white mucus.  Dr. Reddy's examination of her lungs "revealed markedly decreased breath sounds and scattered wheezes, rales, and rhonchi."  (R. 296).   Dr. Reddy's examination of her right shoulder revealed an abduction to 90 degrees with 3/5 grip.  Dr. Reddy's diagnoses included advanced COPD and arthritis in the right shoulder with restriction of movements.  (R. 296-7).

8

On that same day, a technician apparently conducted a pulmonary function test on claimant.  (R. 298).  However, although the record includes a "P.F.T. Checklist," the scores are not attached and are not listed in Dr. Reddy's report.   The ALJ apparently had access to the testing results, noting in his opinion that the testing "determined that the claimant had a severely reduced forced vital capacity but no significant expiratory obstruction."  (R. 23).

In February of 2004, claimant underwent a consultative PRT exam, which found mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; no episodes of decompensation; no evidence of "C" criteria.  The consultant determined that testing indicated no listing level impairments and that claimant was not credible regarding denial of drug use, noting a report of marijuana use 3/03.  Based on claimant's Mental Residual Functional Capacity Assessment, the consultant found that she "could follow routine instructions and sustain attention to simple tasks for at least 2 hour periods.  She would function better with her own work area apart from others.  She could tolerate ordinary work pressures with regular rest breaks.  Contact with the public should be casual.  Feedback should be supportive.  She could adapt to gradual change."  (R. 314-15).

Also on February 23, 2004, Dr. John Whitehead conducted a Residual Physical Functional Capacity Test, finding that she could occasionally lift and/or carry 50 pounds, frequently lift 25 pounds, stand about six hours in an eight hour workday and sit about six hours in an eight hour work day, with no limitations on her ability to push and/or pull.  Her only postural limitations were the inability to climb ladders, ropes, or scaffolds and her only environmental limitations were the avoidance of concentrated exposure to extreme cold; fumes, odors, dusts, gases, poor

9

ventilation; and hazards (machinery, heights, etc.).  The consultant stated that the "claimant alldeges (sic) needing help to pick up items and being out of breath frequently.  Her MER suggests some arthritis and lung problems however her PFT did not show extereme (sic) functional limitations therefore her sptoms (sic) are found to be partially crediable (sic) based on objective evidence."  (R. 322).   Dr. Whitehead also referenced pulmonary function test results – presumably the missing test results from Dr. Reddy's 2004 PFT: FEV1 2.58 69% predicted mild expiratory reduction noted prebronchodilator; FEV1  3.15 post bronchodilator with good effort during test. (R. 319 ).   These values are significantly higher than the 1.15 liters required to meet the criteria of listing 3.02 for COPD.  Under case reviewer's comments, he stated: "PFT's are invalid x2 - but above listings. need not repeat again."  (R. 325).

Claimant received various treatment in 2004 from Dr. Culpepper, her treating physician, for allergies/asthma, heartburn, anxiety after death of her father-in-law, hormonal imbalance, congestion and cough with bronchitis, and repeated episodes of shoulder pain.  The 2004 records include the doctor's instructions to avoid heavy lifting/straining because of shoulder pain, and his prescription of muscle relaxants to treat the pain.  The 2004 records also include repeated instructions to stop smoking and  indicate that claimant continued to smoke throughout 2004.  In May, claimant requested a Nicotrol inhaler, a quit-smoking aid, and indicated that she was using a filter when smoking.  (R. 345).   In June of 2004, Dr. Culpepper saw her for right shoulder pain, and stressed the need for smoking cessation, and claimant stated that she was aware of the risks and admitted that she had not yet used the Nicotrol inhaler.  (R. 344).  In August of 2004, she indicated that she was continuing to use the filter and had reduced the smoking to one or one-and-a-half packs per day.   (R.  342). In December 2004, claimant told Dr. Culpepper that she was

trying to quit smoking and discussed with the doctor symptoms of withdrawal.  The doctor

suggested Wellbutrin therapy to help with smoking cessation, but claimant rejected this idea,

advising him that she had taken it in the past but had trouble with this therapy.  (R. 335).

Hearing

At the hearing on September 15, 2005, the claimant testified that she suffered from the

following pain and physical problems: "abdominal pain, right shoulder pain, numbness in the legs

and feet, swelling in her ankles, bronchitis, recurrent infections, bleeding ulcers, difficulty

sleeping, kidney problems," including kidney cancer, as well as difficulty breathing."   (R. 21, 26).

With respect to mental problems, claimant testified that she suffered depression, and for at least

two years she has had anxiety attacks approximately three times a week.  (R. 21, 445).  She gets

out of breath when she does household chores, and on many days she feels sick and stays in bed

all of the time.  (R. 21, 444-45).  Although claimant acknowledged a history of smoking two

packs of cigarettes a day, she stated that was smoking only half a pack to one cigarette per day and

was trying to quit with the help of nicotine patches and gum, and the use of cigarette filters.  (R.

21, 448-49).  She further acknowledged a history of  marijuana use and alcohol abuse, but denied

current use of these substances. (R. 21, 450).

The VE testified that claimant's past jobs fell within categories ranging from light semi-

skilled to medium un-skilled and that none of her skills would transfer to the sedentary level.  (R.

455).   When the ALJ posed a hypothetical based upon a person in claimant's position for

sedentary work with specified non-exertional limitations, the VE testified that her current

limitations would preclude past relevant work but further testified that she could perform jobs

such as surveillance systems monitor, production inspector and assembler and that these jobs were

11

available in sufficient numbers in the national economy.  The VE testified that if claimant has the restrictions reflected in Dr. Rogers's report of March 2003, she would be unable to work.  (R. 456).

In August of 2005, after the hearing before the ALJ, claimant  had surgery to remove her gallbladder.  (R. 403).   Doctors discovered a cancerous tumor on one kidney, and claimant underwent surgery in September of 2005 to remove that kidney.  (R. 402-3).  The claimant submitted medical records related to her gallbladder and kidney conditions, and the ALJ allowed the record in this case to be supplemented with those medical records.

Opinion

In an opinion dated January 20, 2006, the ALJ determined that the claimant had not engaged in significant gainful activity since her alleged onset of disability.  (R. 21).  He found that claimant suffered from the following severe impairments: "chronic obstructive pulmonary disease, arthritis of the right shoulder, degenerative disc disease at L5-S1, a history of mild cholecystitis status post cholecystectomy (September 2005), and status post left nephrectomy (September 2005), depression, anxiety, and a history of polysubstance (nicotine, caffeine, alcohol, and marijuana) abuse."  (R. 25).  The ALJ found that  these impairments were severe in combination but not severe enough to meet or medically equal a Social Security regulation listing.

With respect to claimant's physical impairments, the ALJ found that normal chest x-rays and treatment records showing clear lungs conflicted with the determinations of consultative doctors who found her COPD to be moderately severe.  In addition, the ALJ found that claimant's failure to stop smoking after doctors instructed her to do so indicated that she made a choice to continue to smoke and militated against a finding of disability.  (R. 27).  Although claimant also

alleged disability because of chronic arthritic pain in her right shoulder and the right side of her neck, the ALJ focused on the lack of evidence of joint, bone, or soft tissue abnormality and the fact that claimant was medically noncompliant with her arthritis medicine. (R. 27). Finally, although claimant underwent surgery in 2005 to remove her kidney after a cancerous mass was discovered, the ALJ stated that claimant was expected to make a normal recovery and to have no resulting significant functional limitations for a period of twelve consecutive months.

With respect to claimant's mental impairments, the ALJ found that claimant's mental impairments, absent on-going substance abuse, did not meet the listings and result in moderate or less work-related restrictions. He also noted that her allegations of being unable to afford mental health treatment were inconsistent with her "ability to maintain her tobacco habit and to engage in marijuana and /or alcohol abuse." (R. 28). His opinion states the following PRTF: "The claimant has moderate restrictions of daily activities and mild to moderate difficulties in maintaining social functioning. Furthermore, her impairments cause moderate deficiencies in concentration, persistence, or pace, but have never resulted in an episode of decompensation for an extended duration." (R. 25).

The ALJ applied the Eleventh Circuit's pain standard, finding that part one of the pain standard was met but that part two was not. He found that although the underlying medical conditions were present that could reasonably be expected to produce the level of pain, anxiety, difficulty breathing and other subjective symptoms that plaintiff alleged, that level of severity would not be true absent ongoing polysubstance abuse. Specifically, the ALJ focused on claimant's 30-year history of tobacco abuse which continued despite her diagnosis of moderately severe COPD and "instructions by her physicians to quit." (R. 27). In June of 2004,

13

approximately eight months after the onset of disability date, claimant's attending physician "stressed the need for smoking cessation," yet claimant responded that she was "aware of the risks." *(Id.)*. In addition, she did not used the Nicotrol inhaler provided. *(Id.)*. The ALJ found that the objective medical evidence, the evidence of claimant's noncompliance and failure to follow through with treatment recommendations, and claimant's testimony about her daily activities were all inconsistent with her subjective allegations of severe impairments. (R. 26).

Accordingly, the ALJ concluded that claimant did not suffer from arthritis pain, depression, anxiety, kidney problems, fatigue, or any other impairment to the extent that she was disabled from work. (R. 28). He determined that she retains the residual functional capacity to perform sedentary work activities, with the following limitations:

> She cannot perform push/pull movements with her right upper extremity. The claimant is unable to work on ladders or climbing devices, drive moving machinery, or work at unprotected heights. She should avoid allergens and irritants. She has minimal limitations in tasks and instructions should be simple. She should have casual contact with the public and co-workers. Supervision should be supportive.

(R. 28).

Based on the VE testimony, the ALJ found the claimant would not be able to perform her past relevant work and that she did not have any transferable skills to the sedentary work level. (R. 29). However, based on the VE's response to his hypothetical question including the specified non-exertional limitations listed above, the ALJ concluded that claimant was capable of working in sedentary jobs such as a surveillance system monitor, production inspector and assembler and that those jobs existed in sufficient numbers in the national economy. (R. 30). Accordingly, the ALJ found that she was not disabled and not entitled to the requested benefits.

(R. 30-31).

The ALJ gave limited weight to the opinions of the consultative evaluations that Dr. Reddy and Dr. Rogers performed in March of 2003, noting that these examinations were performed prior to the claimant's amended onset date.  (R. 30).

The ALJ gave great weight to the opinions of Dr. Arnold who evaluated claimant in January of 2004, noted claimant's caffeine and nicotine dependance, and found only moderate functional limitations with a GAF score of 57. (R. 30).

The ALJ gave great weight to the findings of Dr. Reddy in February of 2004 that claimant had advanced COPD, confirmed by pulmonary function testing and her history of heavy smoking, and arthritis in her right shoulder. (R. 30).

The ALJ noted that he had considered the reports of "state agency medical consultants as well as to other treating, examining, and non-examining medical sources that determined claimant was capable of performing work medium activities with no more than moderate limitations, irrespective of substance abuse." (R. 30).  He did not, however, specify the weight that he accorded these reports, other than the ones listed in the preceding paragraphs.

## VI.  DISCUSSION

### A.  Repeat Pulmonary Function Test

Claimant argues that, in light of the discarded pulmonary function test in 2003, the ALJ's duty to investigate the facts and develop the record required him to order a second pulmonary function test.  As the Government points out, Dr. Reddy did perform a second pulmonary function test in February 2004.  Claimant's confusion is perhaps understandable, because the record includes Dr. Reddy's 2004 report with a pulmonary function test checklist attached but no

results of that test.  However, the record also includes Dr. Whitehead's February 2004 report, which apparently refers to Reddy's 2004 pulmonary function test and lists the partial results, the FEV numbers.   The record also contains Dr. Whitehead's comment that the "PFT's are invalid x2 - but above listing.  need not repeat again."  (R. 325).   Because of  Dr. Reddy's determination that claimant suffered from "advanced" COPD *and* the invalidity of the first pulmonary function test, the court finds troubling the record's omission of the full results of the second test.  The possibility that claimant never received a valid pulmonary function test at all is particularly disturbing.   Under these circumstances, the court finds that the ALJ erred in not developing the record to include the results of at least one valid pulmonary function test.

### B.  Substance Abuse

The ALJ refers to claimant's substance abuse numerous times in his opinion.  He relies on that abuse as a reason for refusing to credit claimant's subjective complaints, as support for his findings that her physical and mental impairments are not severe, and as a reason for finding that claimant is not entitled to disability benefits despite the existence of severe impairments. Although the claimant does not focus on the substance abuse issue in her brief, the Government's brief does.  Because the ALJ's opinion relies on substance abuse as a catch-all reason for finding that claimant is not entitled to disability benefits, the court will also address the issue.

### A. Smoking

Unlike some drug abuse, nicotene abuse itself does not generally render a claimant unable to work.  Nicotene abuse usually becomes relevant in a work context because continued smoking affects a claimant's breathing or exacerbates some other physical problem, resulting in a doctor instructing the claimant to stop smoking.  In a Social Security Disability context, nicotene

addiction usually becomes relevant when the ALJ notes doctor records with instructions to stop smoking and addresses the issue of whether claimant failed to follow the prescribed treatment – cessation of smoking –  without good cause.  Regulation 20 C.F.R. § 404.1530 provides that to get benefits, the claimant must follow prescribed treatment unless she has a good reason not to do so.  It lists examples of "good reasons," such as that the treatment would be against religious beliefs or that the treatment would involve risky surgery.

In the ALJ's opinion denying disability benefits, he mentions substance abuse/addiction or refers to cigarette smoking in at least eleven separate paragraphs, and specifically refers to her cigarette smoking in twenty-five different sentences.  In refusing to credit claimant's subjective complaints, the ALJ addressed her smoking and noncompliance with doctors' instructions to quit smoking.  Applying the pain standard, he found that "[w]hile the claimant clearly has the above stated medically determined severe impairments, *absent ongoing cigarette abuse* and/or polysubstance abuse," she would not meet part two of the pain standard. (R. 27) (emphasis added).  The ALJ further found that "the claimant's failure to stop smoking, when one of her most severe impairments is related to tobacco abuse and the resulting physical limitations, mitigates (sic) against a finding of disability." (R. 27).  The ALJ's extensive discussion of claimant's cigarette use emphasizes its centrality to his finding that she is not disabled.

The record in the instant case does indeed reflect that claimant's doctors repeatedly instructed her to stop smoking.  However, the plaintiff's failure to quit does not necessarily mean that she refused "to follow the prescribed treatment *without a good reason*." *See* 20 C.F.R. § 404.1530. (emphasis added).   As another federal judge sitting in this district has noted, the court cannot assume that the claimant willfully refused to follow treatment from the mere fact that the

claimant did not quit smoking upon receiving her doctor's instructions to do so.  *See Seals v. Barnhart*, 308 F. Supp. 2d 1241, 1250 (N.D. Ala. 2004) (citing *McCall v. Bowen*, 846 F.2d 1317, 1319 (11th Cir. 1988) (finding that claimant's failure to lose weight upon doctor's recommendation dids not constitute a failure to follow treatment)).  The fallacy of this assumption rests in the truly addictive nature of nicotine that makes stopping indeed difficult if not impossible.  *See, e.g.,* www.drugabuse.gov/NIDA_notes/NNVol13N3.

In the instant case, the ALJ found that claimant made a "conscientious choice to continue to smoke." (R. 27).  To support that finding, the ALJ highlights a treatment note in June 2004 reflecting that the doctor stressed the need to stop smoking, the claimant's response that she was aware of the risks, and a statement that she had not yet used her Nicotrol inhaler.  However, that note in itself, while certainly evidence of the instruction to quit smoking, does not necessarily constitute an unequivocal and irrevocable refusal to follow that instruction.

While focusing on the June 2004 records, the ALJ ignored subsequent  medical records that contradict his finding.  For example, a medical record dated August of 2004 indicated that claimant was using filters when smoking and that she had reduced her smoking from two packs-per-day to one or one-and-one-half packs per day.  December 2004 medical records include claimant's statement to her treating physician that she was trying to quit smoking and further reflect that she had already tried Wellbutrin therapy, without success, for smoking cessation.  Further, claimant testified at her hearing that she was using a nicotine patch, nicotine gum, and cigarette filters, and had reduced her smoking from two-packs a day to one-half pack a day some days.  On good days, she smokes only one cigarette a day.  Thus, the record does contain evidence that claimant was taking steps to stop smoking.  Her obvious inability to do so

completely despite those steps does not necessitate a ruling that she voluntary failed to follow the doctor's instructions.  Rather, it provides strong support for a claim of nicotine addiction, which would render her noncompliance as justified.  *See Seals,* 308 F. Supp. 2d at 1251 (stating that claimant's failure to stop smoking would be justified if she was unable to do so because she was addicted to nicotine).   The court also notes that claimant and her doctor discussed "withdrawal symptoms" in December of 2004 in the context of her attempts to quit smoking.  To the extent that the ALJ's statement that she made a "conscientious choice to continue to smoke" represents a finding that she was actually able, mentally and physically, to stop smoking, the court cannot find substantial evidence to support that finding.

Assuming *arguendo* that the ALJ did not err in finding that plaintiff was able to stop smoking and chose not to do so, he nevertheless failed to make another finding essential to the denial of benefits for failure to follow the prescribed treatment: he must find that smoking cessation would restore her ability to work.  As the Eleventh Circuit has explained,

> In order to deny benefits under § 404.1530, the ALJ must find that if the claimant followed the prescribed treatment, his ability to work would be restored, and this finding must be supported by substantial evidence.

*Patterson v. Bowen*, 799 F.2d 1455, 1460 (11th Cir. 1986).  The ALJ made no such explicit finding in his opinion.  When the court applies the proper legal standards to the instant case, it concludes that substantial evidence does not support the ALJ's opinion that claimant's continued cigarette smoking militates against a finding of disability, and the court must reverse and remand this case.

### b.  Alcohol and Marijuana Use

In his opinion denying benefits, the ALJ concluded that "absent ongoing substance abuse,

the claimant is not disabled within the meaning of the Social Security Act." (R. 19-20).  The ALJ
repeats his reliance on claimant's  "on-going polysubstance abuse" as a reason for discrediting
her subjective physical and mental limitations.  (R. 26, 28).  When focusing specifically on her
allegations of disability because of depression, anxiety, and panic attacks, he cited her "ability to
maintain her tobacco habit and to engage in marijuana and/or alcohol abuse" as discrediting her
statement that she could not afford treatment from a mental health professional.  (R. 28).   The
ALJ further found that "claimant does not suffer from any mental [or] nonexertional impairment
of such severity as to require mental health treatment; and that her functional  limitations, absent
substance abuse, are no more than moderate in severity."  (R. 28).

A careful review of the record, however, reflects no evidence that claimant had a current
problem with alcohol during the relevant time period.  The only evidence that she had ever
abused alcohol came directly from claimant herself; she freely admitted to a history of abusing
alcohol, but consistently represented in various records in the 2003-5 time frame that the alcohol
abuse was in the past, and no evidence contradicts her.  Indeed, Dr. Nuckols recorded that
information from a third party substantiated claimant's representations about no current drug or
alcohol problem and no current drug use with the exception of occasional marijuana use.  In
continually referring to claimant's polysubstance abuse, the ALJ did not state the weight that he
gave to Dr. Nuckols's opinion or articulate reasons why he rejected Dr. Nuckols's finding of no
material, current drug or alcohol abuse.  *See Sharfarz v. Bowen,* 825 F.2d 278, 279 (11th Cir.
1987) (stating that "in assessing the medical evidence in this case, the ALJ was required to state
with particularity the weight he gave the different medical opinions and the reasons therefor.").
Further, he did not articulate any factual support for a finding that she was currently abusing

alcohol.  Accordingly, the court finds that the ALJ committed error in failing to state the weight

he accorded to Dr. Nuckols's opinion, and further, that substantial evidence does not support any

finding of alcohol abuse during the relevant time period.

      With respect to marijuana use, the only evidence of that use stemmed from claimant's

admissions that she smoked marijuana occasionally.  Various 2003 medical records include this

consistent admission; on March 11, 2003, she admitted  to last smoking a joint in February of

2003, and on a March 21, 2003 questionnaire, she admitted to smoking marijuana once in the

past month.  She further claimed that friends' gifts funded her occasional use.  However,

subsequent records indicate that she stopped this occasional use; on a 2004 drug and alcohol use

questionnaire and at the hearing in 2005, claimant denied current marijuana use.  No evidence

contradicts her claims of occasional, once-a-month use of  marijuana in 2003 or her subsequent

claims that she had stopped smoking marijuana altogether.  Indeed, Dr. Nuckols addressed her

marijuana use in 2003 and concluded that it was "not material to her being unable [to] work." (R.

248).  As noted previously, the ALJ did not state the weight that he gave to Dr. Nuckols's

opinion or articulate reasons why he rejected Dr. Nuckols's finding of no material marijuana

abuse.  Further, the ALJ did not articulate any factual support for a finding that she was currently

abusing marijuana, or state any reason for rejecting her testimony about marijuana use.

      The court notes that Dr. Rogers referred to claimant's "substance abuse" in his 2003

report; however, that reference was based on her admission that she had abused marijuana in the

past but was currently smoking joints only occasionally. In any case, the ALJ accorded little

weight to Dr. Rogers's 2003 opinion.

      Accordingly, the court finds that the ALJ committed error in failing to state the weight he

21

accorded to Dr. Nuckols's opinion and further finds that substantial evidence does not support

any finding of marijuana abuse during the relevant time period.   In summary, substantial

evidence does not support a finding of alcohol or marijuana  abuse in this case, and the medical

evidence does not alone support such a finding.[3]   Therefore, substantial evidence does not

support the ALJ's denial of disability benefits on that ground.

## VII.  CONCLUSION

For the reasons stated in this memorandum opinion, the court will REVERSE and

REMAND this case to the Commissioner for further action consistent with this opinion.   The

court will enter a separate order.

Dated this 30th day of March, 2009.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

---

[3]Where the evidence fails to support alcohol or marijuana abuse, claimant obviously did not bear the burden of proving that abuse was not a contributing factor material to disability determination.  *See Doughty v. Apfel*, 245 F.3d at 1281 (holding "that in disability determinations for which the medical record indicates alcohol or drug abuse, the claimant bears the burden of proving that the substance abuse is not a contributing factor material to the disability determination . . . .").